The first case is 5100317 Moore v. Vest. We have Mr. Zanten for the appellant, Mr. Steadman for the appellee. Counsel, you may proceed. Good morning, Your Honor. My name is Jay Zanten, and I am representing Julie Moore on this appeal that arises out of a custody ruling that was entered approximately a year ago, on November 2, 2009, after a two-day trial in Marion County, Illinois. The order at that time awarded custody of a child to the father. Subsequent to that order, there was an order of visitation for the mother. We are appealing the custody order. I have two primary arguments to present to the court today with regards to that order that was entered approximately one year ago. The first argument has to deal with the fact that I think it is very apparent from the four corners of the court order itself that the presiding judge in this case did not consider the Section 602 factors. I think it's quite evident that he did not. When you look at that court order, he makes reference at one point to analyzing the case based upon unfitness. Unfitness has not been part of a custody consideration for some time now. He did not find either party unfit. But the fact that he went through an analysis concerning that, I think, raises a red flag initially in terms of the order that was entered. But the court did not stop there. The court went on to even discuss in its ruling that he actually considered whether or not the child should be placed in a foster placement. To be blunt, I have no idea where that comes from. It almost sounds like, to some degree, that the court was looking at this as a juvenile case under the juvenile statutes rather than under the best interest of the child statute. So we start off with that idea of just looking at the court document itself, the court order itself, and looking at his analysis. Furthermore, in the court document itself, in that order, there is no reference to any analysis under 602. Now, I've always been an advocate that I believe in a custody case when somebody, when a judge is making a ruling, that the court should at least mention, at the very least, that they have reviewed the factors and considered the factors and I think actually should make findings of fact. There's some reasons for that, but the law doesn't require that they actually make findings. But in this case, we don't even have a reference to Section 602 at all. Now, what the court did do, well, that's the first part of the argument. The second part of the argument is when you look at how the court ruled, it is also apparent that the court did not review and did not consider the 602 factors. Again, there's no reference to the 602 factors in the order itself. When you take a look at the court order, the court specifically says, talks a little bit about stability to some extent, talks a little bit about the fact that both parties have had an addiction from time to time and the court felt that the father had overcome his addiction and the mother may still be dealing with an alcohol issue. But the bottom line is that that's pretty much the end of the conversation. There's nothing about who was the primary caretaker of the child. There's nothing in this court's analysis concerning who is available to take care of the child. There's nothing in this court order that talks about any of the factors. And one of the factors that a court can consider, as I'm sure you're well aware of, is domestic violence. There was evidence in this case of domestic violence by the father inflicted upon the mother. There's not even, and some of it in front of the child. And there is nothing in this record or nothing in this court order that the court even considered that at all. Was there any evidence disputing that the mother was the primary caretaker? Not in this record. Tell me, how old was the child at the time of the custody judgment? It seems to me that the child was about either four or five years old. And they had lived together for five years? They had lived together for a period of time. At what point did they separate? Boy, I'd have to think about that one for a second. They separated, I think, when the child was about three or four. So I think what you've got is you've got, there was evidence concerning the primary caretaking. It was rather extensive in the record about this mom. And I think what compounds it even more is the fact that during the course of the time that they were actually living together, actually almost up to the time of trial, and this kind of gets into the availability argument, the father had his own business. And the father was working anywhere, and it was admitted by the father. He even admitted that while he was working, mom was taking care of the child. And he was working anywhere between 40 to 80 hours a week. It was not unusual for him to work 70 to 80 hours a week. And this continued almost all the way up to the time that this child was up to the time of the trial. Interestingly, at the time of the trial I'll mention, the father suddenly said, well, I'm only going to work 40 hours a week. But all the way up to that point, he had worked these extended hours. I bring that up because when you get to the point of primary caretaking, it is quite evident that this mother was a primary caretaker. She was the one that was available for the child. And I would submit was going to be the one that continued to be available for the child to take care of this child. I mentioned a little while ago about, well, in addition to the primary caretaking issue and the availability issues, the issue of domestic violence, there was evidence of that, as I mentioned. And again, that was not even referenced at all by the trial court in the trial court's ruling. Another issue that wasn't even addressed that I thought was interesting that it wasn't addressed is the fact that there were times, even since separation of the parties, that the mother tried to talk to the father about things involving the child, to try to get the father involved with the child. And his responses were basically, talk to my attorney, I don't want to talk to you. I mean, there was even a time when the mother was going to go on a trip with the child and she was going to give information to the father concerning where she was going, when she was going to get back, and he basically refused that information from her. I mean, there was evidence that this mother was going, wanted to keep the father involved. There was zero evidence of the opposite. None. And I bring this to the court's attention because when you look at the factors that are set forth in the statute, one of the most important factors I would submit to this court is the willingness and ability of a parent to encourage a relationship between the other parent and the child, a continuing relationship. And these attempts by the mom to keep the father informed, to tell him what was going on, to try to talk to the father, and his, basically, I wouldn't say inability, his unwillingness to be involved in that process, to me, heavily favored mom in terms of any type of analysis because she was at least making an attempt and the father was rebuking that attempt. I would submit to this court that when you look at the factors that were appropriate in this case to analyze, under 602, there's the interaction and interrelationship of the child with his parent or parents. I bring that up because I think that goes right to the heart of who was the primary caretaker. I think it also goes to the heart of who's available for the child, who's going to be there for the child, who has been there for the child in the past, the child's adjustment to his homeschooling community. We have a young child here. We were talking about a 10 or 12-year-old child. I think this issue would be much more important. But one of the things that was said during the trial was that the father wanted a parent to be there, in other words, to be there for the child. Well, historically, up to that point, it was the mother that was there, the mother that was taking care of the child, the mother that was available for the child. If you look through the eyes of the child, which is what I think we do, we don't look through the eyes of mom, we don't look through the eyes of dad, we look through the eyes of the child, the child is going to look at who has been there for me, and that's been, up to at least the time of this order, has been the mom. And I think that's important for a court to consider, and in this case, wasn't considered. I do want to touch on one other thing here. There's the issue of the mental and physical health of all individuals involved under the statute. There was no evidence that I could find from the record of any serious health issue, but there were two issues concerning addictions that I mentioned a little while ago. One of the issues dealt with my client, an alcohol issue. There was also an issue concerning some prescription medication that the father was taking. The reason that I bring this up is because, for some reason, the court jumped all over this and made this, I think, a primary issue. And, fortunately, when you look at the record, I think the record, there's a lot of evidence concerning Vicodin abuse or alcohol abuse. At least the arguments are being thrown out there for the court. There is a distinct difference between those two addictions. On one hand, on the issue of the alcohol situation, there was evidence concerning alcohol consumption and potential abuse by my client. But under the law, if you have some sort of, I guess you could call it addiction or whatever, alcohol, drugs, it's got to be something where it prevents you from functioning or not being able to be a parent. There was never any evidence, never, any evidence in this case that with regard to any alcohol issues involving a mother, that the mother was not, could not be a parent, wasn't able to be a parent. But on the contrary, when you look at the issue of the addiction concerning the Vicodin abuse on behalf of the father, there was direct evidence in the record, in front of this court, about when he was having problems with that abuse, that he wasn't taking care of the child, that it was the mother taking care of the child. And that was admitted not only by the father, it was testified by the mother as well, but the father also admitted that, that because of his addiction, he wasn't taking care of the child. I'm not going to say couldn't, because that was never really brought out in the record, but the fact was, when he was taking this drug, it was the mother that was taking care of the child. I would submit that when you take a look at that, and the law that involves that, the reliance upon the court on that is just over, I think they've overblown that entire situation, involving whether it's alcohol abuse or Vicodin abuse, to the standpoint of that the mother, there was never any evidence that she wasn't able to function as a parent, although there was evidence that the father couldn't and did not function as a parent and allowed the mother to take care of the child during his problem with addiction. In short, I guess in summary, your honors, again, two points. One, there's no reference in that four corners of the document that the court really even looked at 602. I agree with you on the order, there's nothing. Was there no statement by the court considering the factors of 602 at the conclusion of the evidence? The record shows the judge made any comment about 602. I don't recall that, reading that in the record, your honors. I really do not recall that. He took the matter under advisement pretty much immediately after argument. I do not recall that at all. I'll give an opportunity for rebuttal. Thank you. Mr. Steadley. Thank you, your honor. My name is Mark Steadley, and I represent the father of the appellee in this matter. We're here to review a custody determination. We look at the law, and the law tells us that the custody determination should be upheld unless it's against the manifest way to the evidence. Looking at that a little more closely, the court, in examining the record, should view the evidence and the like most favorable to supporting the ruling. And also any implications that could arise out of the evidence should be made in favor of the ruling. And the court should uphold the ruling if there's any basis, and the term is any basis for the trial court's findings. Now, in this matter, opposing counsel brings up three things, and I'll try to address them in reverse order. He brings up the issue of addiction. The evidence was very clear that the father had not drank alcohol for at least 18 months prior to the hearing. His testimony was that he quit drinking, and that testimony was supported by the testimony of everyone else who testified at the trial. The testimony was also clear that he handled his Vicodin addiction in August of 2007, some two years before the trial. In that case, that testimony was also supported by the testimony of the appellant, who acknowledged that he had handled his Vicodin addiction, and she pointed out in her testimony that his relationship with the child improved substantially after the addiction was handled, and he increased his time with the child, and he increased his playing and doing things with the child after that had been resolved. He also noted that he had lost a lot of weight, and he was working better. So that, to me, that demonstrates that the father had responsibly handled his problems with both addictions and had resolved them. Now, on the other hand, the testimony was that the appellant had lost her, or had not lost her older children, but had given up the care of her older children because of abuse of alcohol made her a poor mother. Her family undertook the raising of her three older children. She also acknowledged in her testimony that she still drank and drank at least two times a month, and the evidence also supported that because in the last month before the separation, they separated around the 1st of April of 2009. In the last month, there was two incidences in which she became intoxicated. One of these instances was she was found at a bar in Mason by a friend of the appellee. She was passed out in her car. The bartender had taken her keys to prevent her from driving. She was drinking there alone. The other instance was she returned home late with her son, intoxicated, went in the house, tried to get the child out of bed at a very late hour to play with the child or do whatever with the child. Now, Mr. Opposing Counsel would like us to believe that this type of conduct had no effect on the child, but I would point out a couple of things. In that March 2009 incident where she entered the house late, she was rousing the child out of her sleep. She was obviously intoxicated, and that would have an adverse impact on a 4-year-old child. The other thing I noted, and I think the record would be clear, is at the time of separation, the appellant testified that she had no money, that the appellee was not giving her anything to support the child. She was living in his home, but not providing money for food. Under cross-examination, it became apparent that the appellant had come into possession from the appellee approximately $450 in the month of March. Now, the reason I bring this up at the point of addiction is she had the opportunity to go out and become intoxicated twice during that month using money that the appellee gave her, but she said there was no food in the house, and she didn't have any money for food. So the effects of the addiction upon the child would be this demonstration of irresponsibility towards the care of the child. Now, the other thing he brings up is primary care. The evidence is clear that the appellee, the father, was a self-employed welder. His shop was 50 feet away from his house. He testified he worked 40 to 80 hours, but some of that work was paperwork in the house. But his testimony was also clear that at the time of the trial and since the separation of the parties, in April of 2009, he'd been working consistently 40 hours a week. The other part of the evidence I found noteworthy regarding that is although the appellant was a stay-at-home mom, in 2006, when the child was a year-plus old, she hired a babysitter to come in a few days a week to watch the child. In 2007, she also hired a babysitter to put the child into daycare. The evidence was also clear that practically every evening after the child got a little old enough to walk, in the late afternoon, he'd run down to the shop and stay with dad for a couple hours. So when we talk about primary care, there was evidence that the appellant was taking substantial time away from the child. There was also evidence from both parties as to their shared responsibilities, who got the child up, who gave the child breakfast, and so forth. So I think the implication there is that the appellee is well capable of providing daily care and had shared in that daily care throughout the child's life. Now, when we look for a basis for the court's determination that that was in the best interest of the child to award custody to father, we note that in the order the court found that the father was more stable than the mother, and there's basis for that in their record. First of all, really the basic instance is there was residential stability in the father. The child was born and raised in the father's residence and lived there until April of 2009, or the first of April of 2009, until the child was almost four years old. That was the only home the child knew. The father operated his business in a shop not 50 feet from the home. He was there whenever he was needed. The child attended daycare in Centralia, Grace Care in Centralia, and continued to attend that daycare even after the party separated in April, and he continued to stay in that daycare through the trial. Now, on the other hand, the mother was living in a rented facility in Mount Vernon where she had moved after the separation. Then there's financial stability. The appellee had been self-employed for 12 years, I believe, had flexible hours at work, worked 50 feet from the home so he was always available. He was the sole support of the child and the appellee throughout up until the moment of separation in April. On the financial end, the appellant was employed part-time. And then there's the emotional stability. Now, as I spoke earlier when we spoke about the addiction, I believe that shows the maturation of the father. He handled his addiction to Vicodin correctly. He resolved it. He also realized that alcohol was not something he needed, especially when he had a child, so he ceased that. And he also made himself available for the child whenever he could. And as self-employed and being at the shop next door, he could on a flexible basis. On the other hand, as I spoke earlier when we spoke about the addiction, the mother, although she lost her older children because of her problems with alcohol, had not faced it. She was still dealing with alcohol at the time we tried this case in November of 2009. The other point I would like to make is when we talk about child careability, I addressed that a little bit when I addressed primary care. I would note that the evidence is clear. There was substantial testimony from the father in his part of the proceeding as to what duties he had done for the child and what duties he performed and how he performed them. A review of that evidence showed he's obviously capable of providing daily care. And also there are some admissions by the appellant as to his contributions to the care while they were together. So I don't believe that – well, I believe there's ample evidence in this record to support the court's conclusion that it was in the best interest of the child to award custody to the father. If there's no questions. Thank you, Mr. Steadley. Thank you. We'll model this for granted. Thank you. Well, the first thing I'd like to address, Your Honors, is this. As was the – at the time of the trial, we have now a discussion about this alcohol issue and then the addictions. But I pose this question to Your Honors. If alcohol was such an issue to the father at the time of the separation, why did he let the mom take the child with her? Why was it that she was the one that took care of the child after separation? Why did he allow her to do that? If it was such a problem, if it was such an issue concerning that, why is she allowed then to take this child? I would submit that it is an overblown issue. Secondly, there was even a temporary order entered in this case. And at the time the temporary order was entered, there was no issue concerning the alcohol issue or even the – for that matter, the Vicodin issue. There was nothing in that order at that point. And if it was such a problem, why wasn't it addressed at that point? It manifests way to the evidence, Your Honors, is when the findings appear to be either unreasonable, arbitrary, or not based on the evidence. If you keep in mind the issue of the primary caretaker, and the one point I'd like to bring up real quick is that opposing counsel talks about the use of babysitters and what have you. What it was was a preschool. I didn't know that was – I always thought that was kind of a good thing for kids, to be able to interact with other kids. So I don't see how that's that big a deal. And I'd also point out that this judicial circuit has routinely and consistently emphasized primary caretaking responsibilities. In the case of Dahl and Cooper that I mentioned in my briefs to you, they have – you have consistently talked about the primary caretaker and the importance of a primary caretaker. And in those same two cases, they also address the issue of availability of a parent. And in the Dahl case, this Court talked about how the – that involved a sheriff, and in that case, the sheriff worked irregular hours. And that was something that the trial court considered, and the appellate court agreed that the trial court should have considered that. In the Cooper case, in that case, the father worked long hours during the week and then brought work home during the weekend, worked at home during the weekend. The Cooper case is exactly what we have here, exactly what we have here, where he's working long hours during the week and then he's bringing stuff home and he's working at home during the weekends, and at least leading all the way up to the time of trial. That's exactly what the situation we have here. And in both of those cases, the court – this court talked about – I won't say availability was a word they used, but they talked about the fact that there was a parent that was doing other things other than caretaking for a child. And that's exactly what the situation was here. Again, I just – this court – or the trial court did not consider 602, whether it's referenced in there or not, did not consider it, and certainly based upon the record before this court, did not consider it and just totally ignored it based upon what the evidence was and what the arguments were, and I would submit to this court that that ruling should be reversed. Thank you, counsel. We appreciate your arguments and the briefs. We'll take the matter under advisement. The court's aware that it is a 311A extradited appeal, and we will give due attention to that situation. Thank you.